**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **INTERNATIONAL PETROLEUM PRODUCTS AND ADDITIVES COMPANY, INC.,** | : : : | |
| | : | |
| **Plaintiff,** | : : | **Case No. 1:20-cv-00586** |
| **v.** | : : | **Chief Judge Algenon L. Marbley** |
| **PXL CHEMICALS BV,** *et al.*, | : : | |
| **Defendants.** | : | |

**OPINION & ORDER**

This matter is before the Court on numerous motions from multiple parties, including Motions to Dismiss from Defendants PXL Chemicals BV and PXL Chemicals LLC (ECF No. 14) and from Defendant Lorenzo Napoleoni (ECF No. 22). This Court also entertains Plaintiff's Motion for Leave to File Sur-Reply to PXL Defendants' Reply Brief (ECF No. 24), Motion for Leave to File Sur-Reply to Mr. Napoleoni's Reply Brief (ECF No. 28), and Motion for Leave to File Supplemental Memoranda (ECF No. 31), as well as Defendants' Motion for Sanctions (ECF No. 33). For the reasons set forth below, Defendants' motions to dismiss (ECF Nos. 14, 22) are **DENIED**. Plaintiff's motions for leave to file sur-replies (ECF Nos. 24, 28) and Defendants' Motion for Sanctions (ECF No. 33) are also **DENIED**. Plaintiff's Motion for Leave to File Supplemental Memoranda (ECF No. 31) is **GRANTED**.

## I. BACKGROUND

### A. Factual Background

1

Plaintiff International Petroleum Products and Additives Company, Inc. ("IPAC"), a petroleum additive manufacturer, alleges that Defendants, through their various connections and relationships to each other, have together engaged in misconduct regarding IPAC's trade secrets to produce and sell knock-offs of IPAC's products to IPAC customers.

According to Plaintiff, the problem arose initially from sales representative and distributor agreements that IPAC signed with Black Gold S.A.R.L. ("Black Gold") of Monaco, which is operated and owned in part by Defendant Lorenzo Napoleoni. (ECF No. 1 ¶¶ 2–3). Mr. Napoleoni is a resident of Monaco. (ECF No. 22 at 4). The company has no other employees and is entirely owned by Mr. Napoleoni and his wife. (ECF No. 1 ¶ 3). Pursuant to the agreements, Black Gold agreed to be a sales representative and distributor for IPAC. (*Id.* ¶ 2). Black Gold received IPAC's confidential information regarding products, customer lists, financial terms, research, development, and manufacturing, including the identities of IPAC's direct and indirect customers, and the quantity and pricing of products purchased by those customers. (*Id.* ¶¶ 2, 4, 11; ECF No. 1-1 at 5).[1] The Sales Representative Agreement required Black Gold to keep confidential all information received from Black Gold about information about sales, customers, products, pricing, and other information for five years after the end of the agreement. (ECF No. 1-1 at 11). The

_____

[1] ECF No. 1-1 consists of an arbitration award, *Int'l Petrol. Prods. and Additives Co., Inc. v. Black Gold S.A.R.L.*, AAA Case No. 01-18-0001-9728 (2019) (Dosker, Arb.), attached as an exhibit to Plaintiff's Complaint. The arbitration proceeding was held between Plaintiff and Mr. Napoleoni's company, Black Gold S.A.R.L. The arbitration findings were confirmed over the objections of the defendant in that proceeding. *See Int'l Petrol. Prods. and Additives Co., Inc. v. Black Gold S.A.R.L.*, 418 F. Supp. 3d 481 (N.D. Cal. 2019). Defendants dispute the relevance of the exhibit to this case, suggesting that the arbitration "decision is legally irrelevant," that they are not bound by the arbitration, and that the arbitrator either failed to analyze or failed to provide factual proof for several issues — including whether the PXL Defendants were a unitary business and whether IPAC had trade secrets that were misappropriated and used by the PXL Defendants. (*See generally* ECF No. 23 at 2–3). Courts are permitted to consider exhibits attached to the complaint in considering motions to dismiss. *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Accordingly, this Court considers the arbitration award as part of Plaintiff's factual allegations.

Exclusive Distributor Agreement had no time duration and thus apparently required confidentiality indefinitely. (ECF No. 1-1 at 12–13). Black Gold also agreed not to provide service or assistance to competitors regarding competing products. (ECF No. 1 ¶ 2). Beyond requiring confidentiality and non-disclosure agreements, IPAC also sought to protect its confidential information by placing password protection on documents, limiting access to information, and keeping information in locked offices. (*Id.* ¶ 63).

During the period covered by the sales representative and distributor agreements, Mr. Napoleoni floated the idea of forming a competing additives business with Mr. Steven Plitt and Dr. Jeffrey Crow, both employees of IPAC. (*Id.* ¶¶ 5–6; ECF No. 1-1 at 14). Despite Dr. Crow's concerns that the formation of such a business would be difficult without using IPAC's confidential information, Mr. Napoleoni and Mr. Plitt proceeded anyway. (ECF No. 1-1 at 14). Prior to Mr. Plitt's departure from IPAC in August 2016, he emailed to himself information about IPAC's business, including a password-protected spreadsheet with information about the identity, vendor, price, and composition for each component of IPAC products. (ECF No. 1 ¶ 8; ECF No. 1-1 at 5). Mr. Plitt did not have a legitimate IPAC business reason for doing so, nor was this in keeping with his standard work practice: typically, if he needed to use confidential IPAC information, he would access that information via Citrix on IPAC's computer systems, rather than forwarding information to himself. (ECF No. 1-1 at 14, 20). Mr. Plitt then used anti-forensic software to wipe his work laptop twice, in July and August 2016. (ECF No. 1 ¶ 9).

On January 10, 2017, Mr. Plitt formed PXL Chemicals LLC ("PXL LLC"), based in Loveland, Ohio, and incorporated in Ohio. (*Id.* ¶¶ 12–14, 37). Mr. Plitt along with Defendant Mr. Napoleoni then founded PXL Chemicals BV ("PXL BV") in the Netherlands on July 31, 2007. (ECF No. 1-1 at 14–15). Both Mr. Napoleoni and PXL LLC are shareholders of PXL BV, while

Mr. Plitt and either Michael Bryne Plitt or Steven Andrew Plitt, Steven Plitt's sons, are the co-owners of PXL LLC. (ECF No. 1 ¶¶ 12, 14, 16, 19). Defendant Mr. Napoleoni, on the other hand, does not have a direct ownership connection with PXL LLC but worked with Mr. Plitt, who is an Ohio resident, to form the two PXL companies. (*See id.* ¶ 45).

PXL Chemicals LLC and PX Chemicals BV were, according to Plaintiff's allegations, effectively the same company. (*Id.* ¶ 17). The website for www.pxlchemicals.com listed Mr. Plitt as "Founder / CEO" and Mr. Napoleoni as "Founder / COO" and included both an Ohio address and an international address in the Netherlands. (*Id.*). At first, Mr. Plitt told Plaintiff that he had formed PXL with his son as a "consultant company." (ECF No. 1-1 at 10). But within months of formation, PXL held itself out as a "next general chemical and additive company" and marketed several additive products that competed against IPAC's products. (ECF No. 1 ¶¶ 18, 21, 23). PXL was able to develop these competing additives in a short time frame, despite having no test facilities, no formulation capability, no blending or other technical expertise, and no chemists. (*Id.* ¶ 21). Language on the PXL Chemicals website attributed the company's additive product innovation to Mr. Plitt's knowledge, though he did not have any experience developing or formulating additive products during his time at IPAC. (*Id.* ¶ 18).

PXL Chemical's lubricative additive products were found to be "strikingly similar" to IPAC's corresponding products and IPAC customers reported that "PXL tells its customers that the [PXL] products are safe to use because they are knock offs of IPAC's formulations." (*Id.* ¶¶ 22, 25; ECF No. 1-1 at 16, 18). Through Mr. Napoleoni, PXL Chemicals gained confidential IPAC information about customers and pricing, which IPAC had given to Mr. Napoleoni's distribution company Black Gold pursuant to their sales and distribution agreements, and then used that information to sell its products to IPAC customers. (ECF No. 1 ¶¶ 23, 65). In the wake of

4

PXL developing additive products in competition with IPAC and marketing those products to IPAC customers, IPAC sales have declined. (*Id.* ¶ 24). PXL BV products continue to enter the US market through PF5, an Ohio consulting firm founded by Mr. Plitt and headquartered at the former Ohio address of PXL LLC. (*See* ECF Nos. 14-1 ¶¶ 10, 12; 19 at 4).

In February 2018, Black Gold indicated to IPAC that it wished to terminate its sales representative and distribution contracts. (ECF No. 1-1 at 6). The original distribution agreements between IPAC and Black Gold stipulated that, when the agreements ended, the latter was required to "cooperate with IPAC, to surrender all records to IPAC, and to do whatever is reasonably required by IPAC in order to continue a viable business with IPAC the customers served by the distributor." (ECF No. 1-1 at 12). Additionally, all IPAC documents in the possession of Black Gold were required to "be promptly and safely returned to IPAC." (*Id.* at 10 (quoting from Section 8 of the Sales Representative Agreement)). Black Gold did not, however, return IPAC's documents after the end of their relationship. (*Id.* at 17). In fact, Black Gold retained possession of several hundred IPAC documents, including customers lists, price lists, and information about products, processes, services, research and development, inventions, etc. (*Id.* at 17–18). When asked during arbitration how PXL could develop additive products so quickly after being formed, Defendant Mr. Napoleoni testified that "[he] had it," referring to those unreturned IPAC documents. (*Id.* at 19).

IPAC then sought an injunction against Black Gold, Defendant Mr. Napoleoni, and his wife, Ms. Sofia Napoleoni, in the U.S. District Court for the Northern District of California. (*See* ECF No. 1 ¶ 27; *see generally* ECF No. 1-1). The arbitrator found that Black Gold had breached its Sales Representative Agreement and its Exclusive Distributor Agreement with IPAC. (ECF No. 1-1 at 22). More specifically, the arbitrator found that Defendant Mr. Napoleoni, the co-owner

5

and operator of Black Gold, had "caused IPAC Confidential Information to be misappropriated and misused to formulate and make and market and sell PXL products." (*Id.* at 21). Consequently, the arbitrator enjoined Black Gold and anyone working in concert with Black Gold from using, disclosing, or possessing IPAC's confidential information, and from making, marketing, or selling products formulated based on IPAC's confidential information. (*Id.* at 37). The injunction and award were confirmed by the district court. (*See* ECF No. 1-2).

The aftermath of that award is still awaiting full resolution. IPAC sought to collect the arbitration award of $1,094,193.58 from Black Gold in both Monaco and the United States but to no avail. In May 2020, Black Gold commenced insolvency proceedings in Monagesque court, which set May 29, 2019, as the date of Black Gold's "cessation of payments" or insolvency date.[2] *See In re Black Gold S.A.R.L.*, 635 B.R. 517, 522 (B.A.P. 9th Cir. 2022). In November 2020, Mr. Jean-Paul Samba, who was appointed trustee by the Monagesque bankruptcy proceeding, filed for recognition of the Monagesque proceeding in California bankruptcy court and for chapter 15 bankruptcy as the foreign representative of Black Gold. *See id.* at 523. The bankruptcy court initially denied recognition of the Monagesque bankruptcy proceeding as contrary to U.S. public policy, *see* but the decision was overturned earlier this year by the Bankruptcy Appellate Panel of the Ninth Circuit. *See generally id.*

## B. Procedural Background

Plaintiff filed the complaint in this action on July 29, 2020, pursuing damages for trade secret misappropriation and other alleged misconduct, and injunctions against all Defendants. (ECF No. 1). Plaintiff named PXL BV, PXL LLC, Mr. Napoleoni, and DOES 1–5 as Defendants.

---

[2] Coincidentally, May 29, 2019, is also the date that the arbitration award against Black Gold was confirmed.

The DOES are not identified; Plaintiff pinpoints an adult son of Mr. Steven Plitt, either Bryce Plitt or Steven Andrew Plitt, as one of the DOES and an unknown subsidiary of PXL Chemicals LLC as another of the DOES. (*Id.* ¶¶ 55–56). In September 2020, Defendants PXL BV and PXL LLC (collectively "PXL" or "the PXL Defendants") submitted a motion to dismiss (ECF No. 14). In November 2020, Defendant Mr. Napoleoni submitted a separate motion to dismiss (ECF No. 22). In addition to the dispositive motions, three other related motions are before this Court. Plaintiff has submitted two motions for leave to file sur-replies (ECF Nos. 24, 28) in response to Defendants' replies (ECF Nos. 23, 27) to Plaintiff's responses in opposition to the motions to dismiss (ECF Nos. 19, 25); Plaintiff also requests leave to file further documents beyond their sur-replies in support of those sur-reply briefs (ECF No. 31). Defendants have submitted a motion for sanctions (ECF No. 33). In June 2022, this case was transferred from Judge Black to the docket of Chief Judge Marbley. (*See* ECF No. 37). All motions are ripe for this Court's review.

## II. STANDARD OF REVIEW

Defendants move to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), for improper venue under Federal Rule of Civil Procedure Rule 12(b)(3), and for failure to state a claim under Federal Rule of Civil Procedure Rule 12(b)(6).

### A. Personal Jurisdiction

A federal court sitting in diversity may exercise jurisdiction over a defendant if jurisdiction is "both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 888 (6th Cir. 2002). A court can exercise two types of personal jurisdiction: "specific jurisdiction, which is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction, and general, all-purpose jurisdiction." *Carrier Corp. v.*

7

*Outokumpu Oyj*, 673 F.3d 430, 449 (6th Cir. 2012) (internal quotations omitted) (quoting *Indah v. U.S. Sec. & Exchange Comm'n*, 661 F.3d 914, 920 (6th Cir. 2011)).

When the court's exercise of jurisdiction is challenged in a motion to dismiss, "the plaintiff may not stand on his pleading but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.* at 449 (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)). In determining whether plaintiff has met its burden, the district court "may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." *Theunissen*, 935 F.2d at 1458. If the district court chooses to rely solely on the pleadings and affidavits, it must consider such materials "in a light most favorable to the plaintiff[s]" and must not "weigh 'the controverting assertions of the party seeking dismissal.'" *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017) (quoting *Theunissen*, 935 F.2d at 1459). And, in such cases, "the plaintiff need only make a 'prima facie' case that the court has personal jurisdiction." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012) (citing *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 (6th Cir. 2006)). Thus, the motion to dismiss should be denied if the plaintiff sets forth "specific facts that support a finding of jurisdiction." *Kroger Co.*, 437 F.3d at 510. Although "this [C]ourt will not consider facts proffered by the defendant that conflict with those offered by the plaintiff," *Neogen Corp.*, 282 F.3d at 887 (citing *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)), it "may consider the defendant's undisputed factual assertions." *Conn*, 667 F.3d at 711.

## B. Venue

Under Federal Rules of Civil Procedure 12(b)(3), a party may move for dismissal of a case for improper venue. Venue is proper under 28 U.S.C. § 1391(b) in: (1) any district in which the

defendant resides, if all defendants are residents of the state; (2) a district "in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;" or (3) if there is no other district where the action may be brought so long as the court has personal jurisdiction over the defendant. "The Plaintiff's burden at this stage is to make a *prima facie* showing that venue is proper." *Ackison Surveying, LLC v. Focus Fiber Sols., LLC*, 2016 WL 1449456, at *2 (S.D. Ohio 2016) (internal citations omitted). In evaluating the motion to dismiss, a court can decide on the basis of affidavits alone or conduct an evidentiary hearing. *See Serras*, 875 F.2d at 1214 (6th Cir. 1989). But if a court decides on the motion without a hearing, it "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Centerville ALF, Inc. v. Balanced Care Corp.*, 197 F. Supp. 2d 1039, 1046 (S.D. Ohio 2002) (quoting *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir. 1980). Finally, a plaintiff's burden extends to showing that venue is "proper for each claim and as to each defendant in order for the court to retain the action." *Verbis v. Iowa Dep't of Hum. Servs.*, 18 F. Supp. 2d 770, 774 (W.D. Mich. 1998) (internal citations omitted).

### C. Failure to State a Claim

A motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) operates to test the sufficiency of the complaint and permits dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Such a motion "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). Accordingly, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor the plaintiff." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*,

521 F.3d 555, 559 (6th Cir. 2008)). Although the court's primary focus will be on the allegations in the complaint, the court may also consider "any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

To survive a motion to dismiss, "the plaintiff must allege facts that, if accepted as true, are sufficient to raise a right to relief above the speculative level and to state a claim to relief that is plausible on its face." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (internal quotations omitted) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is considered plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And though the court "must accept all well-pleaded factual allegations in the complaint as true," the court "need not accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

### III.     LAW & ANALYSIS

### A.     Preliminary Matters

If IPAC were granted leave to file sur-replies, the contents of the sur-replies would be before the Court for consideration when ruling on the motions to dismiss. Thus, as a preliminary matter, this Court first addresses Plaintiff IPAC's Motion for Leave to File Sur-Reply Brief in Response to PXL Defendants' Reply Brief Dated Nov. 19, 2020 (ECF No. 24) and Motion for Leave to File Sur-Reply Brief in Response to Mr. Napoleoni's Reply Brief Dated Dec. 17, 2020 (ECF No. 28). This Court also considers whether to grant Plaintiff's Motion for Leave to File

Supplemental Memoranda (ECF No. 31), which the Court construes as a further sur-reply given Plaintiff's representation that the motion is intended "to supplement its previously submitted sur-reply briefs." (ECF No. 31 at 1). IPAC argues that the Sur-Reply Briefs are necessary because both the PXL Defendants and Defendant Mr. Napoleoni "have raised various new arguments and assertions for the first time" in their reply briefs. (ECF Nos. 24 at 1, 28 at 2). Specifically, IPAC contends that the PXL Defendants objected to the Arbitration Award attached to Plaintiff's Complaint for the first time in their reply brief (ECF No. 23). (*See* ECF No. 24 at 1). IPAC suggests that the same is true with respect to Defendant Mr. Napoleoni's reply brief (ECF No. 27), and further that Mr. Napoleoni raised arguments about Black Gold's bankruptcy proceeding — and attached a thirty-seven (37) page document about that proceeding — for the first time in his reply brief. (ECF No. 28 at 2).

The Federal Rules of Civil Procedure do not contemplate the filing of sur-replies. This Court's Local Civil Rules permit additional memoranda only "upon leave of court for good cause shown." S.D. Ohio Civ. R. 7.2(a)(2). While the Rules do not define good cause, the Sixth Circuit has noted that additional filings "may be allowed in the appropriate circumstances, especially '[w]hen new submissions and/or arguments are included in a reply brief, and a non-movant's ability to respond to the new evidence has been vitiated.'" *Key v. Shelby Cnty.*, 551 F. App'x 262, 265 (6th Cir. 2014) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003)). Similarly, "this Court has consistently held that in order for a party to be given permission to file a sur-reply, the reply brief must raise new grounds that were not presented as part of the movant's initial motion." *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, 2010 WL 4117552, at *4 (S.D. Ohio Oct. 19, 2010) (citations omitted). In such cases, allowing a sur-reply is justified because considering "arguments raised for the first time in a reply brief . . . deprives the [opposing]

11

party of its opportunity to address the new arguments." *Cooper v. Shelby Cnty., Tenn.*, 2010 WL 3211677, at *3 n.14 (W.D. Tenn. Aug. 10, 2010) ("arguments raised for the first time in a reply brief are generally not considered because such a practice deprives the non-moving party of its opportunity to address the new arguments"); *cf. Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (noting that "[a]n argument raised for the first time in reply brief will not be considered by this Court" (citing *Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986))). But a counterpoint raised in a reply brief in response to an argument made in the non-movant's response brief does not constitute a new argument warranting sur-reply. *See Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 798 (W.D. Tenn. 2012).

Ultimately, this Court has "broad discretion to manage its docket" in determining whether a movant has shown good cause. *ACLU of Kentucky v. McCreary Cnty.*, 607 F.3d 439, 451 (6th Cir. 2010) (citing *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)). Courts in the Southern District may permit a party to file a sur-reply even without showing good cause if it does not result in prejudice toward the opposing party. *See Nat'l City Bank v. Aronson*, 474 F. Supp. 2d 925, 930 (S.D. Ohio 2007). Moreover, the Sixth Circuit has a "strong preference that claims be adjudicated on their merits." *Coleman v. Shoney's, Inc.*, 79 F. App'x 155, 157 (6th Cir. 2003) (citing *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991)). Any evidence used to support a sur-reply that is deemed permissible must, however, "be limited to that needed to rebut the positions argued in memoranda in opposition." S.D. Ohio Civ. R. 7.2(d).

This Court finds that IPAC has failed to show good cause with respect to its first two motions to file sur-replies (ECF Nos. 24, 28). IPAC suggests that the PXL Defendants and Defendant Mr. Napoleoni discuss the Arbitration Agreement in their Reply Briefs (ECF Nos. 23,

27) for the first time, whereas the Opening Briefs (ECF Nos. 14, 22) were silent on the issue. It is true that the PXL Defendants' Motion to Dismiss (ECF No. 14) does not mention the Arbitration Agreement at all and Defendant Mr. Napoleoni's Motion to Dismiss (ECF No. 22) does so only briefly. (*See* ECF No. 22 at 1 (mentioning the "arbitration award" twice in the Introduction but no further instances in the Argument)). It is also true that both Reply Briefs mention the Arbitration Agreement extensively. (*See* ECF Nos. 23 at 2–4, 27 at 2–5). The Reply Briefs' discussion of the Arbitration Agreement, however, is dedicated entirely to countering arguments made by Plaintiff in their replies to the motions to dismiss and not at all to proposing new legal arguments or presenting new evidence. Moreover, Plaintiff spends the entirety of their sur-replies rebutting arguments already briefed by the parties. For example, questions about the credibility and content of Mr. Napoleoni's affidavit have already been discussed by both parties in detail. (*See, e.g.*, ECF No. 19 at 3–6; ECF No. 23 at 4–5). This Court is fully capable of assessing Mr. Napoleoni's affidavit, its content, and its applicability to Defendants' motions to dismiss without further briefing; likewise, it can determine whether Plaintiff has "plausibly alleged" the relevant facts without further briefing.

On the other hand, Plaintiff's Motion for Leave to File Supplemental Memoranda (ECF No. 31) alerts the Court to new developments in related proceedings elsewhere. So, too, does Defendants' Notice of Supplemental Authority (ECF No. 38). And in both cases, the attached arbitration decisions do not prejudice the opposing parties and are relevant to this case.

Accordingly, Plaintiff's motions for leave to file sur-replies (ECF Nos. 24, 28) are **DENIED** and the sur-reply briefs are **STRICKEN**. Plaintiff's Motion for Leave to File Supplemental Memoranda (ECF No. 31) is also **GRANTED**.

### B.    Motion to Dismiss

13

The PXL Defendants and Defendant Mr. Napoleoni both request that this Court dismiss IPAC's claims on the basis of lack of personal jurisdiction, improper venue, and failure to state a claim.  This Court considers each basis for dismissal in turn.

### 1.    Personal Jurisdiction

In diversity actions, personal jurisdiction exists only if such jurisdiction is consistent with both the forum state's long-arm statute and the Fourteenth Amendment's Due Process Clause. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000).  Here, the forum state is Ohio. Because "the Ohio Supreme Court has determined that Ohio's long-arm statute does not extend to the limits of due process," *Mid-West Materials, Inc. v. Tougher Industries, Inc.*, 484 F. Supp. 2d 726, 730 (citing *Goldstein v. Christiansen*, 638 N.E.2d 541, 545 n.1 (Ohio 1994)), this Court must evaluate both whether the exercise of specific personal jurisdiction is allowed under Ohio's long-arm statute and whether it "comports with the constitutional due process requirements of the United States Constitution." *Retail Serv. Sys., Inc. v. Mattress by Appointment, LLC*, 210 F. Supp. 3d 916, 924 (S.D. Ohio 2016) (*citing CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996)).   "[P]ersonal jurisdiction can exist in two forms: specific jurisdiction and general jurisdiction." *Indah*, 661 F.3d at 921.

Defendant PXL BV argues that this Court does not have personal jurisdiction over it since it is an out of state company and has no ties to Ohio.  (ECF No. 14 at 3–16).  Likewise, Defendant Mr. Napoleoni requests that this Court grant his motion to dismiss on effectively the same basis — namely, that he is an out-of-state resident with no connections to the state of Ohio.  (ECF No. 22 at 4–16).  Both defendants alleges that they do not transact any business or maintain minimum contacts in the state of Ohio.

### a.  Personal Jurisdiction Over PXL BV

Courts are authorized to assert general jurisdiction over a foreign corporation where the corporation's "affiliations with the State are 'so continuous and systematic' as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tire Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Typically, a corporation is "at home" in the forums where its principal place of business or place of incorporation are located. *Id.* at 139. But there are also "exceptional case[s], . . . [where] a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139 n.19.

Plaintiff here does not allege that PXL BV has its principal place of business or its place of incorporation in Ohio, the forum state. Instead, Plaintiff suggests that "PXL USA and PXL BV have held themselves out as a unitary business with two locations." (ECF No. 1 ¶ 17). The unitary business theory is, in effect, another name for the alter-ego theory, which "provides for personal jurisdiction 'if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction.'" *Indah*, 661 F.3d at 921 (citing *Estate of Thomson ex rel. Est. of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008)); *see also State ex rel. DeWine v. S&R Recycling, Inc.*, 195 Ohio App. 3d 744, ¶ 27, 2011-Ohio-3371, 961 N.E.2d 1153, 1158–59 (Ohio Ct. App. 2011) (noting the use of the alter ego theory "as a vehicle to obtain personal jurisdiction over an officer of a corporation that cannot otherwise be reached in a certain state"). In such cases, "federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court" as long as the related "corporation [] would be subject to

15

personal jurisdiction in that court." *Toyota Motor Corp. Worldwide*, 545 F.3d at 362 (quoting *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)). To determine whether a company or individual is the alter ego of the parent company,

> Ohio courts consider factors such as whether (1) corporate formalities are observed, (2) corporate records are kept, and (3) the corporation is financially independent. This Court has considered additional factors such as (1) sharing the same employees and corporate officers; (2) engaging in the same business enterprise; (3) having the same address and phone lines; (4) using the same assets; (5) completing the same jobs; (6) not maintaining separate books, tax returns, and financial statements; and (7) exerting control over the daily affairs of another corporation.

*Id.* at 362–63 (internal citations omitted).

Here, it is undisputed that PXL LLC, as an Ohio corporation, is subject to general personal jurisdiction by this Court. *See Daimler AG*, 571 U.S. at 118 ("The paradigm all-purpose forums for general jurisdiction are a corporation's place of incorporation and principal place of business."). Plaintiff has also plausibly alleged that PXL LLC and PXL BV are, in effect, "fundamentally indistinguishable" as one unitary corporation. *Cf. Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075, 1086 (Ohio 1993) ("[A] concise statement of the alter ego doctrine[:] a plaintiff must show that the individual and the corporation are fundamentally indistinguishable."). PXL LLC and PXL BV engaged in the same business. They shared a single website. (ECF Nos. 1 ¶ 17, 1-1 at 15). They were formed by and operated by the same two individuals. (*See* ECF Nos. 1 ¶ 17, 1-1 at 15 (noting that the website for PXL Chemicals listed Mr. Plitt and Defendant Mr. Napoleoni as the "Founder / CEO" and "Founder / COO," respectively, of PXL Chemicals — without making any distinction between PXL LLC and PXL BV)). The website listed the address of both PXL LLC's office in Ohio and PXL BV's office in the Netherlands, with the inference that the Cincinnati and Rotterdam addresses were simply two branches of the same company. (*See* ECF No. 1-1 at 15). Altogether, PXL Chemicals LLC and

16

PXL Chemicals BV held themselves out as a solitary entity, with a shared website, shared offices, shared key personnel, shared products, and shared operations. In other words, PXL LLC and PXL BV appeared to have "no separate mind, will, or existence of [their] own." *Belvedere Condo. Unit Owners' Ass'n*, 617 N.E.2d at 1086.

The PXL Defendants dispute the idea that PXL LLC and PXL BV are a unitary enterprise; instead, they note that "PXL BV is a separate and distinct legal entity from PXL LLC" and that "PXL BV does not share a location with PXL LLC in either Ohio or the Netherlands." (ECF No. 23 at 6). The PXL Defendants also argue that "PXL BV is not an Ohio corporation and . . . has no officers or employees residing in Ohio." (ECF No. 14 at 10). This argument is supplemented with an affidavit from Defendant Mr. Napoleoni, stating that "PXL BV does not maintain a place of business in Ohio[,] . . . have any managers, officers, or directors in Ohio[,] . . . have any employees who resides in Ohio[,] . . . [or] own or lease any real property in Ohio." (ECF No. 14-1 ¶¶ 5–7). But distinct legal entities are not inherently immune from being classified as an alter ego. *See, e.g.*, *Laborers Pension Trust Fund-Detroit and Vicinity v. Interior Exterior Specialists Constr. Grp., Inc.*, 394 F. App'x 285, 287, 289 (6th Cir. 2010) (affirming the district court's determination that "TLG was an alter ego of IES," even though IES and TLG were separate companies and neither were owned by the other). And the contentions that PXL BV does not share a location with PXL LLC, does not have an Ohio office, and does not have any officers residing in Ohio are undermined by PXL Chemical's website, which "show[ed] locations in both Ohio and the Netherlands" and "identif[ied] Mr. Plitt [an Ohio resident] as 'Founder/CEO.'" (ECF No. 1-1 at

15).[3]  As Plaintiff notes, Defendant Mr. Napoleoni's affidavit statements fail to contradict Plaintiff's allegations about PXL BV's *past* conduct and relationships with Mr. Plitt and PXL LLC, which are central to this Court's inquiry here.  (*See* ECF No. 19 at 5).

This Court acknowledges that the relationship here, where alter ego jurisdiction as to the subsidiary, rather than the parent, is in question, is unusual.  But while it is true that, "[n]ormally, courts apply the alter-ego theory of personal jurisdiction to parent-subsidiary relationships," *Toyota Motor Corp. Worldwide*, 545 F.3d at 362, such a relationship is not a prerequisite.  Ohio courts have not squarely addressed the issue of when, if ever, alter ego jurisdiction is applicable outside of the parent-subsidiary paradigm.  *Cf. Minno v. Pro-Fab, Inc.*, 121 Ohio St.3d 464, ¶ 13, 2009-Ohio-1247, 905 N.E.2d 613, 617 (Ohio 2009) (holding narrowly "that a plaintiff cannot pierce the corporate veil of one corporation to reach its sister corporation . . . [where] neither corporation has any ownership interest in the other corporation").  Other jurisdictions in this circuit, on the other hand, have explicitly considered this question and found that "an alter ego relationship can be established between entities that are not in a parent-subsidiary relationship" for the purposes of asserting personal jurisdiction.  *Wang v. Gen. Motors, LLC*, 2021 WL 2134210, at *3–*4 (E.D. Mich. May 26, 2021) (collecting cases); *see also Nichols v. Pabtex, Inc.*, 151 F. Supp. 2d 772 (E.D. Tex. 2001).  After all, the premise of alter ego jurisdiction rests on the "substance, not form, of the inter-corporate nexus."  *Superior Coal Co. v. Ruhrkohle, A.G.*, 83 F.R.D. 414, 421 (E.D. Pa. 1979) (citing *K. J. Schwartzbaum v. Evans, Inc.*, 44 F.R.D. 589, 591 (S.D.N.Y. 1968).  And here, PXL BV and PXL LLC are not simply sister companies that are "separate" and "unable

---

[3] The PXL Defendants do not dispute, in either their Motion to Dismiss (ECF No. 14) or their Reply (ECF No. 23), that the website for PXL Chemicals (www.pxlchemicals.com) is associated with PXL BV or that the website listed the information described above.

to exercise control over each other." *Minno*, 905 N.E.2d at 617. Instead, Plaintiff has alleged that the two are inextricably and indistinguishably linked, as demonstrated by PXL LLC's ownership interest over PXL BV, Mr. Plitt and Mr. Napoleoni's joint control over both companies, and the fact that they held themselves out to the world as one entity. In short, Plaintiff IPAC has pled a plausible account that PXL BV and PXL LLC were alter egos of the same entity.

* * *

Through the discovery process, PXL Defendants may ultimately be able to demonstrate that PXL LLC and PXL BV had entirely distinct corporate structures or unrelated operations, or that PXL BV had no connection to the Ohio address listed on its own website. At this stage of the litigation, however, this Court will draw all reasonable inferences in favor the plaintiff. *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 903. As such, this Court finds that it has general jurisdiction over Defendant PXL BV.

### b. Personal Jurisdiction Over Defendant Mr. Napoleoni

By contrast, this Court cannot assert general personal jurisdiction over Defendant Mr. Napoleoni. As the Supreme Court has clarified, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Daimler AG*, 571 U.S. at 137. Mr. Napoleoni's domicile, in this case, is in Monaco. (ECF No. 22 at 4). Alter ego jurisdiction, as articulated above, is not applicable here: Plaintiff has not alleged that Mr. Napoleoni has any ownership interest over PXL LLC and cannot be considered its alter ego. (*See* ECF No. 1 ¶¶ 14, 19). Moreover, both the Sixth Circuit and this Court have found that "personal jurisdiction under the [Ohio] long arm statute must be specific rather than general." *Capitol Specialty Ins. Corp. v. Splash Dogs, LLC*, 801 F. Supp. 2d 657, 665 (S.D. Ohio 2011) (quoting *Black v. Usher Transp.*, 2010 WL 2465379, at *2 (S.D. Ohio June 11, 2010)).

This Court first looks at whether the assertion of jurisdiction over Mr. Napoleoni complies with Ohio's long-arm statute, which allows a court to "exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's . . . [t]ransacting any business in [Ohio]." Ohio Rev. Code § 2307.382(A). To "transact" business means "to prosecute negotiations; to carry on business; [or] to have dealings." *Retail Serv. Sys., Inc.*, 210 F. Supp. 3d at 924 (quoting *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 559 N.E.2d 477, 480 (1990)). Here, Plaintiff has made a *prima facie* showing that Defendant Mr. Napoleoni transacted business in the state of Ohio. Per Plaintiff's allegations, Mr. Napoleoni collaborated with an Ohio resident to start a new company together. (*See* ECF No. 1 ¶ 12). Together, they formed PXL BV, which Mr. Napoleoni co-owned alongside a corporation, itself owned by Ohio residents. (*Id.* ¶¶ 12, 14, 19). Mr. Napoleoni and Mr. Plitt held themselves out as the co-founders of PXL Chemicals, an entity with an Ohio address. (*See id.* ¶ 17). They operated PXL Chemicals together, which held itself out as a company with an Ohio location. (*Id.* ¶¶ 17, 50). Based on these factual allegations, Defendant Mr. Napoleoni — through his work with Mr. Plitt and his operation of a corporate entity that held itself out as having an Ohio address — is subject to personal jurisdiction under the "transacting business" provision of Ohio's long-arm statute.

The Court next considers whether the exercise of personal jurisdiction here comports with the requirements of due process. The Sixth Circuit has provided guidance on this inquiry in the form of a three-part test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Calphalon Corp.*, 228 F.3d at 721 (quoting *Southern Mach. Co. v. Mohasco Indus.*, 401 F.2d 374, 381 (6th Cir. 1968).  Because "the Ohio long-arm statute's transacting any business standard is coextensive with the purposeful availment prong of constitutional analysis," *Rsch. Inst. at Nationwide Children's Hosp. v. Trellis Bioscience, LLC*, 2016 WL 5791194, at *8 (S.D. Ohio Sept. 30, 2016) (internal quotations omitted), the preceding analysis, which showed that Mr. Napoleoni's actions qualify as "transacting business," also suffices to demonstrate that he has "purposefully availed" himself of conducting business in the forum state.

Defendant relies on an unreported case from outside this district, *R.I.A. Melbourne Ltd. P'ship v. Forman Capital, LLC*, 2008 WL 2388012 (N.D. Ohio June 6, 2008), to suggest that his "fortuitous" contacts with the Ohio resident, Mr. Plitt, are insufficient to establish purposeful availment.  (*See* ECF No. 22 at 12–13).  While Defendant's recitation of *R.I.A. Melbourne* is correct, "the Sixth Circuit [has] suggested that a key inquiry in the purposeful availment analysis is whether the defendant intends to establish continuing relationships and obligations in the forum state."  *Ault Int'l Med. Mgmt., LLC v. City of Sevierville*, 2020 WL 1244190, at *3 (S.D. Ohio 2020); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (distinguishing between "contacts [that] result from actions by the defendant *himself*" and the "unilateral activity of another party or third person" (emphasis in original)).  The defendant in *R.I.A. Melbourne* did not appear to establish continuing relationships in Ohio, given that the communications aimed at Ohio were "brief," the relationship with an Ohio resident was not initiated by the defendant, and the wire transfers from Ohio bank accounts were "unilateral activit[ies]" of the plaintiff.  *R.I.A. Melbourne*, 2008 WL 2388012, at *5–*6.  The Sixth Circuit has also suggested that the duration of the defendant's relationship with Ohio matters.  *See Condon v. Flying Puck, LLC*, 35 F. App'x 173, 174 (6th Cir. 2002) (distinguishing the contractual relationship at issue, because of its short

21

duration, from the "ongoing business relationship" in *Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998)). In the present case, Mr. Napoleoni's connections with Ohio were not brief or unilateral; instead, Mr. Napoleoni deliberately sought to establish a new business with Mr. Plitt under Ohio laws and with an Ohio office, indicating a long term, ongoing business relationship.

With respect to the intentional torts claims, Plaintiff has also shown that Defendant Mr. Napoleoni has sufficient minimum contacts with Ohio. The "effects test," first explained in *Calder v. Jones*, 465 U.S. 783 (1984), guides this Court's evaluation of whether a nonresident's actions in an intentional torts case rise to the level of purposeful availment. Under this test, "personal jurisdiction exists where an individual purposefully directs activities towards the forum state with the intent to cause harm there." *Scotts Co. v. Aventis S.A.*, 145 F. App'x 109, 113 (6th Cir. 2005). Plaintiff IPAC has plausibly alleged that Mr. Napoleoni directed communications at Mr. Plitt, an Ohio resident, intending to disrupt the business relationship between Plaintiff and Mr. Plitt. (ECF No. 1 ¶ 84); *see Corp. Bertec v. Spartac Software Corp.*, 2020 WL 2112162, at *3 (S.D. Ohio May 4, 2020) ("[Defendant's] actions, however, were directed at disrupting an ongoing business relationship in Ohio, thus causing a consequence in Ohio."). Subsequently, Mr. Napoleoni operated a business that held itself out as a forum state corporation together with Mr. Plitt.

The second prong of the due process analysis requires the "cause of action to arise from the defendant's activities there." *Calphalon Corp.*, 228 F.3d at 721. At a minimum, this requires that "the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities." *Southern Mach. Co.*, 401 F.2d at 384 n.27. Plaintiff alleges that Defendant Mr. Napoleoni directed communications at Steven Plitt in Ohio in the course of founding and operating PXL Chemicals, and that these communications constituted the misuse and misappropriation of IPAC trade secrets. (ECF No. 1 ¶¶ 44, 46). Although the allegations are somewhat lacking in

22

specificity, the inferences drawn are not unreasonable: the well-pled allegations that Mr. Napoleoni and Mr. Plitt together formed the PXL entities to misappropriate IPAC trade secrets leads to the natural conclusion that Mr. Napoleoni discussed the actions underlying that misconduct with Mr. Plitt, an Ohio resident. *See Schmückle*, 854 F.3d at 899. In other words, the very misconduct that Plaintiff alleges arose out of Mr. Napoleoni's communications with Mr. Plitt about PXL. Thus, the trade secret misappropriation claims arise out of Mr. Napoleoni's communications and collaborations in Ohio.

When a court has determined that the first two prongs are met, "the inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." *Am. Greetings Corp. v.* Cohn, 839 F.2d 1164, 1170 (6th Cir. 1988) (quoting *First Nat'l Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982)). In determining if the third prong is met — that is, whether the acts of the defendant have a substantial enough connection to the forum state to make exercise of jurisdiction reasonable — "courts consider the following factors: '(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the policy.'" *Corp. Bertec*, 2020 WL 2112162, at *6 (citing *Air Prods. and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 555 (6th Cir. 2007)).

Although this case does pose an unusual twist, *cf. Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co., Ltd.*, 91 F.3d 790, 797 (6th Cir. 1996) (warning that "[s]pecial concerns arise when a plaintiff attempts to bring a foreign defendant within our national borders"), the burden of litigating this case in Ohio for Mr. Napoleoni "does not [by itself] overcome the 'inference of reasonableness' that attaches when a plaintiff demonstrates purposeful availment and that the cause of action arises from the state connections." *Corp. Bertec*, 2020 WL 2112162, at *6 (quoting

*Schneider v. Hardesty*, 669 F.3d 693, 704 (6th Cir. 2012)). This is especially so where Ohio has a strong interest in business being conducted fairly and legally within its borders. *See Ault Int'l Med. Mgmt.*, 2020 WL 1244190, at *3. Defendant's assertion that "Ohio has no interest in protecting a California resident's legal options" ignores this Court's commitment to ensuring that both Ohio corporations and foreign entities that do business with Ohio firms stay within the limits of its laws. (ECF Nos. 22 at 15, 14-1 ¶ 10 (reporting that Mr. Napoleoni continues to work with PF5, an Ohio corporation)). Plaintiff's interest in pursuing relief for its alleged damages also weighs in favor of finding personal jurisdiction over Mr. Napoleoni. *See also In re Black Gold S.A.R.L.*, 635 B.R. at 522–24 (detailing Plaintiff IPAC's difficulties in recovering its arbitration award against Mr. Napoleoni's distribution company, Black Gold).

Finally, the fourth factor is neutral — even though a California court would have an interest in adjudicating this matter, given Plaintiff's connections to and arbitration award in California, Plaintiff's claims rest on Ohio law and center on conduct carried out in Ohio. Because Mr. Napoleoni has not brought forward considerations sufficient to overcome the strong inference of reasonableness, this Court finds that the exercise of jurisdiction over Mr. Napoleoni is reasonable and comports with due process.

### 2.    Venue

Alternatively, Defendants PXL BV and Mr. Napoleoni both ask this Court to dismiss the case on grounds of improper venue. (*See* ECF Nos. 14 at 15–16, 22 at 16–17). Under § 1391(a)(2), proper venue requires that "a substantial part of the events or omissions giving rise" to a plaintiff's claims occur in the forum district. Courts do not "ask which district among the two or more potential forums is the 'best' venue," *First of Michigan Corp. v. Barmlet*, 141 F.3d 260, 263 (6th Cir. 1998) (quoting *Setco Enters. Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994)), but rather

"whether the district the plaintiffs chose had a substantial connection to the claim, whether or not other forums had greater contacts." *Robbins*, 19 F.3d at 1281.

As discussed at length above, the Southern District of Ohio has a substantial connection to IPAC's alleged claims. Defendant PXL BV was deeply intertwined with PXL LLC, an Ohio corporation based in Cincinnati, and held itself out as one business with an Ohio office. PXL BV is alleged to have developed and marketed products based on trade secrets in conjunction with an Ohio corporation. And Mr. Napoleoni, despite his residence elsewhere, is alleged to have directed communications at an Ohio resident and to have helped operate the PXL Chemicals' endeavors, which happened in part in Ohio. Under these circumstances, there are enough ties to this district to satisfy the "substantiality" test of 28 U.S.C. § 1391(b)(2).

### 3. Failure to State a Claim

Finally, all Defendants ask this Court to dismiss the case for failure to state a claim. Plaintiff's claims can be broken into three categories: (1) trade secret misappropriation claims (Counts I and II); (2) common law claims (Counts III, IV, and V); and (3) violation of injunction (Count VI). This Court addresses each category of claims in turn.

### a. Trade Secret Misappropriation Claims

To state a claim for misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831–1839, a plaintiff must show: (1) the existence of a protectable trade secret; and (2) the misappropriation of the trade secret by defendant. *See, e.g.*, *Corp. Bertec*, 2020 WL 2112162, at *7. For claims pursuant to the Ohio Uniform Trade Secrets Act ("OUTSA"), Ohio Rev. Code §§ 1333.61–1333.69, a plaintiff must demonstrate: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 122

25

(6th Cir. 2019) (quoting *Heartland Home Fin., Inc. v. Allied Home Mortg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008)). Defendants suggest that Plaintiff has not pled plausible allegations that demonstrate any of these elements.

Regarding the first element, Defendants simply state that IPAC cannot show the existence of trade secrets, but do not explain why that is so. (*See* ECF Nos. 14 at 17, 22 at 18). "Trade secret" is defined similarly under both the DTSA and the OUTSA: it entails "information" that the owner seeks to protect as confidential and that has economic value from not being publicized. *See* 18 U.S.C. § 1839(3); Ohio Rev. Code § 1333.61(D). The Supreme Court of Ohio has further expanded on this definition with a six-factor test to determine whether information is a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997). Here, Plaintiff claims that its trade secrets include "customer lists, products, processes, services, research, development, inventions, manufacture, purchasing, accounting, engineering, marketing, merchandising, selling, price and internal policies." (ECF No. 1 ¶ 61). This definition, though broad, clearly encompasses information with economic value; IPAC is in the business of manufacturing additives, and it is valuable to IPAC not to have competitors know their product formulations, customers, and manufacturing processes. The lengths to which Mr. Plitt went to acquire proprietary IPAC information (and to hide his acquisition) further support the proposition

that that information has economic value.[4]  (*See id.* ¶¶ 8–10).  Moreover, IPAC has outlined the measures it has taken to protect its confidential information, including the use of password protection, non-disclosure and confidentiality agreements, limits on access to information, and locked doors.  (ECF No. 1 ¶ 75).  In fact, Defendant Mr. Napoleoni himself previously signed confidentiality and non-disclosure agreements with IPAC as head of Black Gold.  (*See* ECF No. 1-1 at 11–12 (excerpting the Sales Representative Agreement and Exclusive Distributor Agreement between IPAC and Black Gold).  IPAC's allegations in the complaint sufficiently state the existence of trade secrets.

The foregoing facts also suggest that Plaintiff has met its burden to plead facts giving rise to a reasonable inference that trade secrets were acquired through confidential relationships.  Defendant Mr. Napoleoni, as the co-owner and operator of Black Gold, had access to IPAC trade secrets and had an obligation through the sales representative and distribution agreements to keep that information confidential.  (*See* ECF No. 1 ¶ 11).  Mr. Plitt acquired, and forwarded to himself, IPAC trade secrets while an employee of IPAC.  And it is reasonable to infer that the PXL Defendants also had access to IPAC trade secrets through their co-founders Mr. Napoleoni and Mr. Plitt.

Defendants also contend that Plaintiff failed to show the "unauthorized use" of the trade secrets, because "IPAC relies on hearsay and conclusory allegations to assume Defendants

_____

[4] This Court acknowledges that there is some dispute about the precise nature of Mr. Plitt's actions.  (*Compare* ECF No. 1-1 at 19 (detailing the arbitrator's findings in *Int'l Petroleum Prods. and Additives Co., Inc., v. Black Gold, S.A.R.L., et al.*, AAA Case No. 01-18-0001-9728 (2019) (Dosker, Arb.) that Mr. Plitt e-mailed himself confidential IPAC documents with no legitimate IPAC business in purpose, *with* ECF No. 38-1 at 9–10 (outlining the arbitrator's conclusion in *Int'l Petroleum Prods. and Additives Co., Inc., v. Steven Plitt*, JAMS Case No. 1120014056 (2022) (Hasse, Arb.) that Mr. Plitt did not destroy or delete electronic documents from his laptop, contrary to IPAC's allegations that he "wiped" his laptop)).  At the motion to dismiss stage, however, "this [C]ourt will not consider facts proffered by the defendant that conflict with those offered by the plaintiff."  *Neogen Corp.*, 282 F.3d at 887.

released products resembling IPAC product." (ECF No. 14 at 17). This Court agrees that "it is improper for a court to consider hearsay statements when ruling on a motion to dismiss," *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499, 506 (6th Cir. 2014), but finds that Plaintiff's Complaint provides a sufficient basis to support its allegations that Defendants misappropriated trade secrets. Mr. Plitt and Defendant Mr. Napoleoni had "IPAC invoices, marketing information, pricing lists and product data sheets" as well as a "password-protected Microsoft Excel file detailing the identity, vendor, price, and relative composition for each component in each of IPAC's products." (ECF No. 1-1 at 7, 19). They then jointly founded the PXL Defendants and, within five months of formation, were able to market and sell additive products, some of which were deemed to be knock-offs of IPAC products at arbitration.[5] (*Id.* at 13–14, 16–17). And when Mr. Napoleoni was asked how PXL was able to develop products so quickly without the use of IPAC's trade secrets, Mr. Napoleoni admitted that he "had it available." (*Id.* at 21). Dismissal is inappropriate here, where Plaintiff has articulated a theory of trade misappropriation, replete with "factual enhancement," *see Corp. Bertec*, 2020 WL 2112162, at *8 (quoting *Exal Corp. v. Roeslein & Assocs., Inc.*, 2013 WL 6843022, at *5 (N.D. Ohio Dec. 27, 2013), based on Defendants' possession of specific confidential documents and use of that information to develop knock-offs of IPAC products.

**b. Common Law Claims**

---

[5] In other contexts, the Sixth Circuit has held that "a district court may admit an arbitrator's decision as evidence" as long as there are sufficient indications of procedural fairness and an adequate record. *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 549, 550 n.3 (6th Cir. 2008); *see also McDonald v. City of West Branch, Mich.*, 466 U.S.248, 292 n.13 (1984) (clarifying that in § 1983 cases, "an arbital decision may be admitted as evidence"). The same rationale applies here, and this Court considers the arbitrator's findings as part of the factual allegations set out by Plaintiff.

Defendants suggest that all of IPAC's common law claims — including the claims of tortious interference with contractual or business relations (Count III), civil conspiracy (Count IV), and unjust enrichment (Count V) — should be dismissed because the claims are preempted by the OUTSA. The OUTSA preempts conflicting "tort, restitutionary, and other laws" that provide "civil remedies for misappropriation of a trade secret." Ohio Rev. Code § 1333.67(A). To determine if preemption is warranted, this Court looks at "whether 'the claims are no more than a restatement of the same operative facts' that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Stolle Mach. Co., LLC v. RAM Precision Indus.*, 605 F. App'x 473, 485 (6th Cir. 2015) (quoting *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 989 (N.D. Ohio 2008)). But, at this stage in the litigation, plaintiffs are "permitted to plead claims in the alternative, and a court may not dismiss claims as preempted until the parties have a chance to develop the facts during discovery to assess whether 'facts different from those comprising the misappropriation claim support the state common law state claims.'" *Corp. Bertec*, 2020 WL 2112162, at *8 (quoting *Thermodyn Corp.*, 593 F. Supp. 2d at 990).

Defendants suggest that, even if Plaintiff's common law claims are not preempted by OUTSA, they lack factual support, but fail to elaborate on this argument and do not provide any indication of what precisely is missing. (*See, e.g.*, ECF No. 14 at 19). But, for the sake of completeness, this Court explains why IPAC has satisfied its pleadings requirements. First, for a claim for tortious interference with contract, a plaintiff must demonstrate: "(1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) the lack of justification; and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999). Here, IPAC has alleged the existence of contracts with Mr. Napoleoni and Mr. Plitt. (*See, e.g.*, ECF No. 1 ¶ 2).

Plaintiff has alleged that both individuals had actual knowledge of each other's contracts with IPAC.

Demonstrating the third and fourth elements of tortious interference requires a plaintiff to "show that the defendant's interference with another's contract was improper." *Bridge v. Park Nat'l Bank*, 2003 WL 22976520, at *2 (Ohio Ct. App. Dec. 18, 2003). Factors for determining impropriety include the nature of the actor's conduct and the actor's motive. *Id.* Under this analysis, the impropriety of Defendants' conduct is clearly demonstrated here: Defendants' actions, as pleaded by IPAC, were intended to breach their agreements with Plaintiff. IPAC has also sufficiently alleged that Defendants' motives in breaching the agreements were to compete against Plaintiff for Plaintiff's existing customers, in contravention of the agreement by Defendant Mr. Napoleoni's company "to do whatever is reasonably required by IPAC in order to continue a viable business with IPAC the customers served by the distributor." (ECF No. 1-1 at 12). And finally, Plaintiff has alleged that these actions caused economic harm in the form of lost sales. (*See* ECF No. 1 ¶ 24). In short, Plaintiff has sufficiently alleged the elements of a tortious interference claim under Ohio state law.

Second, civil conspiracy is defined, by Ohio courts, as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995) (citations omitted). Additionally, "an underlying unlawful act is required before a civil conspiracy claim can be successful." *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998). Civil conspiracy "does not require a showing of an express agreement between defendants, but only a common understanding or design, even if tacit, to commit an unlawful act." *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996). Nevertheless, "if one person could lawfully

30

commit an act, then that act committed by two or more persons cannot support a conspiracy claim." *Id.* at 497 (citing *Palmer v. Westmeyer*, 549 N.E.2d 1202, 1207–08 (Ohio Ct. App. 1988). Here, Plaintiff has alleged that two or more people or entities — including all Defendants — worked together to commit trade secret misappropriation, the underlying unlawful act; Plaintiff has also alleged that Defendants intended to and succeeded in causing economic harm to Plaintiff.

Finally, an unjust enrichment claim exists where: "1) a benefit is conferred by a plaintiff on a defendant; 2) the defendant has knowledge of the benefit; and 3) the defendant retains the benefit under circumstances where it is unjust to do so." *Randleman v. Fid. Nat. Title Ins. Co.*, 465 F. Supp. 2d 812, 824 (N.D. Ohio 2006). In seeking dismissal of this claim, Defendants provide only a bare statement that "IPAC provides no factual basis to support these claims" (besides their claim of OUTSA preemption, which is not applicable for the same reasons discussed above). (ECF No. 14 at 19). The facts alleged by Plaintiff include: that Plaintiff conferred trade secrets to Defendant Mr. Napoleoni and to the PXL Defendants, via Mr. Napoleoni and Mr. Plitt; that Defendants were aware of and used that knowledge; and that Defendants benefited from the use of that knowledge. Accordingly, Plaintiff has stated a claim for unjust enrichment.

\* \* \*

Because it is possible that further discovery would enable IPAC to base its tortious interference, civil conspiracy, and unjust enrichments claims on facts different from those alleged in its trade secret claim, dismissal on the basis of OUTSA preemption is inappropriate at this juncture. *See Corp. Bertec*, 2020 WL 2112162, at \*8. After all, OUTSA preempts only those claims that "are no more than a restatement of the same operative facts" that comprise a plaintiff's statutory trade secret misappropriation claims. *Glasstech, Inc. v. TGL Tempering Sys., Inc.*, 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999). Here, Plaintiff has not yet had an opportunity to demonstrate

that its alternative civil remedies are based on based on misappropriation of a trade secret, or an opportunity to conduct discovery for that aim. In other words, dismissal of Counts III through V on the basis of preemption is premature.

### c. Violation of Injunction

Defendants also move to dismiss Plaintiff's violation of injunction claim, on the basis that none of the Defendants was named in the injunction that was entered against Black Gold. (ECF Nos. 14 at 20, 22 at 21–22). Defendant Mr. Napoleoni, who co-owned and operated Black Gold, the named party in the arbitration proceeding, argues first that "the injunction is against Black Gold not Mr. Napoleoni" and further that "IPAC fails to allege Mr. Napoleoni aided and abetted Black Gold." (ECF No. 22 at 20, 21). The PXL Defendants essentially make the same arguments, with the additional point that their connection to Black Gold is even more attenuated than Mr. Napoleoni's. (*See* ECF No. 14 at 20). The fact that Defendants are not named in the arbitration is not, on its own dispositive: a non-party may be bound by an injunction if she "act[s] in concert or participation with a party against whom an injunction has been issued" and has actual notice of the injunction. *Midland Steel Prods. Co. v. U.A.W. Local 486*, 573 N.E.2d 98, 102 (Ohio 1991); *see also In re NAACP, Special Contribution Fund*, 849 F.2d 1473 (6th Cir. 1988). This is true too in California, the forum of the original arbitration hearing between IPAC and Black Gold. (*See* ECF No. 1-1 at 29 ("If any non-party to this arbitration later contends that the injunction issued in this Final Award . . . may not be enforced against such non-party to this arbitration solely because it or he or she was not within the arbitral jurisdiction of the Arbitrator in ruling on IPAC's claims in this arbitration or was not named as a Respondent in this arbitration, that contention would be unsupported by either California law or United States federal law." (internal citations omitted)). To evaluate if Defendants are "in active concert or participation with an enjoined party, we look

to the actual relationship between the two." *Tesmer v. Granholm*, 333 F.3d 683, 703 (6th Cir. 2003). A non-party is deemed to be in active concert or participation "if that party is identified with the named, enjoined party in interest, in 'privity' with it, represented by it or subject to its control." *Id.* (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).

As an initial matter, Mr. Napoleoni is subject to the previous arbitration award (ECF No. 1-1) as the co-owner and operator of Black Gold. *See* Fed. R. Civ. P. 65(d)(2)(B) (noting that injunctions bind "the parties' officers, agent, servants, employees, and attorneys"). Defendant Mr. Napoleoni does not dispute that "the arbitration award is binding on him acting as a representative of Black Gold" but appears to dispute the legal effect of the award on him as an individual. (ECF No. 27 at 3). This is because, Mr. Napoleoni suggests, "the arbitrator determine[ed] that there is no arbitral jurisdiction over claims against Mr. Napoleoni under both agreements." (*Id.* (citing ECF No. 1-1 at 24–25). This Court is unable to find the same conclusion anywhere in the arbitration decision. Moreover, this Court is unable to find any authority (and Defendant Mr. Napoleoni does not cite any) holding that an individual who is legally bound as the officer or representative of an entity subject to the restrictions of an injunction is free to act in contravention of those same restrictions in his free time; to the contrary, "an officer of the corporation and the one responsible for the corporation's affairs[] was subject to the court's [injunctive] order just as the corporation itself was," regardless of "whether or not [the officer] was a named defendant in the order, or even mentioned at all." *Elec. Workers Pension Trust Fund of Loc. Union #58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 382 (6th Cir. 2003) (citations omitted).

Moreover, Plaintiff IPAC has adequately alleged that Defendants' actions "assisted" Black Gold, the party named in the injunction. It is uncontested that the previous arbitration award (ECF No. 1-1) enjoined Black Gold and any aiders and abettors from "making, marketing or selling any

33

product formulated or otherwise made using IPAC Confidential information," among other provisions. (ECF No. 1-1 at 37). Black Gold is a distribution company; it does not make additives. Instead, it is the PXL Defendants (and Mr. Napoleoni as founder and COO) that have engaged in the "making, marketing or selling" of knock-off IPAC products, per Plaintiff's allegations. To put it another way, it is the PXL Defendants, acting in concert with Mr. Napoleoni and using trade secret information procured through the enjoined party, who are bringing about a result forbidden by the injunction. *See Additive Controls & Measurement Sys., Inc. v. Flowdata Inc.*, 154 F.3d 1345, 1353 (Fed. Cir. 1998) (finding that non-parties are subject to injunctions where "they act with an enjoined party to bring about a result forbidden by the injunction").

Accordingly, Plaintiff IPAC has adequately pled allegations that Defendants, despite being non-parties to the arbitration award, are violating the injunction by being in active concert or participation with Black Gold.

## C.     Motion for Sanctions

Defendants have also filed a motion for sanctions against Plaintiff's counsel, Mr. Joshi (ECF No. 33). Defendants argue that Mr. Joshi has knowingly made false and misleading statements about Mr. McGrath and Mr. Carr, and that this Court has the inherent power to sanction this kind of bad faith conduct. (*See id.* at 5). Specifically, Defendant cite five comments from Plaintiff's Motion for Leave to File Supplemental Memoranda (ECF No. 31), wherein Plaintiff's counsel makes three statements about the actions of "the defendants' counsel, the Dentons law firm," without distinguishing between particular attorneys who work at Dentons — with the implication that the behavior of other Dentons' lawyers in related cases can be attributed to or linked with the behavior of Mr. McGrath and Mr. Carr, the Dentons' lawyers who represent Defendants in this case. (*See* ECF No. 33 at 3). The other two referenced statements by Mr. Joshi

34

explicitly question "the credibility of Mr. Napoleoni and its counsel." (ECF No. 33 at 3). With respect to the first three comments listed in Defendants' Motion for Sanctions (ECF No. 33), this Court finds that Mr. Joshi's use of relative clauses in each comment sufficiently clarifies that he is referring to the Dentons law firm and not to the particular Dentons lawyers working on this case, especially as those relative clauses are not used elsewhere.[6]  Therefore, this Court focuses its analysis on whether the fourth and fifth comments cited in Defendants' motion are evidence of bad faith.

To determine if counsel's conduct was "tantamount to bad faith" and thus worthy of sanction pursuant to a court's inherent authority,[7] the Sixth Circuit has proscribed a three-part test, requiring courts to find: "(1) that the claims advanced were meritless; (2) that counsel knew or should have known this; and (3) that the motive for filing suit was for an improper purpose such as harassment" before issuing sanctions. *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011) (citing *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997)). But a court must also keep in mind that its "inherent powers must be exercised with restraint and discretion," and reserved only for situations where "the conduct of a party or an attorney is egregious." *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 516 (6th Cir.

---

[6] The three comments, for reference are: "1. '(T)he Bankruptcy Court for the Northern District of California (Bankr. N.D. Cal.) made determinations about Mr. Napoleoni **and the defendants' counsel**, namely the Dentons law firm, that are directly relevant to the motions to dismiss.' 2. 'The **same counsel as here**, namely the Dentons law firm, represented Black Gold and Mr. Napoleoni in the bankruptcy proceeding.' 3. 'IPAC asserts in its opposition papers to both motions that Mr. Napoleoni and **the Dentons firm** . . . .'" (ECF No. 33 at 3 (internal citations omitted)).

[7] Federal district courts have at least three sources of authority to impose sanctions – based on Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, or the court's inherent authority. *See Dubuc v. Green Oak Twp.*, 482 F. App'x 128, 132 (6th Cir. 2012) (inherent authority); *Hall v. Liberty Life Assurance Co. of Boston*, 595 F.3d 270, 275 (6th Cir. 2010) (Rule 11 and 28 U.S.C. § 1927). As Defendants do not suggest that this Court should sanction Mr. Joshi pursuant to Rule 11 or 28 U.S.C. § 1927, this Court evaluates only whether sanctions are appropriate pursuant to its inherent authority. *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 513 (6th Cir. 2002) (holding that a district court does not need, "in every case, to exhaust consideration of sanctions under other relevant rules and/or statutes" before levying sanctions under its inherent authority).

2002) (first quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); and then quoting *Martin v. Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995)).

At the outset, this Court notes that it disfavors statements by counsel accusing opposing counsel of hiding information or seeking to deceive the Court without strong factual basis. Mr. Joshi's assertions implying that Mr. McGrath or Mr. Carr participated in the bankruptcy court proceeding were unwarranted because Mr. Joshi should have known the identities of opposing counsel in that case from attending hearings and reading briefing, but were not entirely without colorable basis, given the engagement letter between Dentons and Black Gold that listed Mr. McGrath and Mr. Carr. (*See* ECF Nos. 33-1, 34-3, 35 at 3). Moreover, Mr. Joshi's statements, even if potentially misguided, were made in an effort to discredit Mr. Napoleoni's affidavit as support for Defendants' motions to dismiss, rather than for "an improper purpose such as harassment." *Big Yank Corp.*, 125 F.3d at 313; *see also First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 115 F. Supp. 2d 898, 907–08 (S.D. Ohio 2000), *aff'd* 307 F.3d 501 (6th Cir. 2002) (finding filing meritless litigation to force settlement payment to be an improper purpose). Accordingly, this Court finds that sanctions are not warranted, but does caution counsel to ensure that any attacks on credibility must be made with restraint and only where absolutely warranted by a sound factual basis.

## IV. CONCLUSION

For the reasons discussed above, the PXL Defendants' Motion to Dismiss (ECF No. 14) and Defendant Mr. Napoleoni's Motion to Dismiss (ECF No. 22) are **DENIED**. Plaintiff's motions for leave to file sur-replies (ECF Nos. 24, 28) are **DENIED**. Plaintiff's Motion for Leave to File Supplemental Memoranda (ECF No. 31) is **GRANTED**. Defendants' Motion for Sanctions (ECF No. 33) is **DENIED**.

**IT IS SO ORDERED.**

_____

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  September 28, 2022**